**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

---

SECURITIES AND EXCHANGE COMMISSION,

     *Plaintiff*,

v.

NADER POURHASSAN and
KAZEM KAZEMPOUR,

      *Defendants*.

No. 22-Civ-3284

---

**REPLY IN SUPPORT OF DEFENDANT KAZEM KAZEMPOUR'S
<u>MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.    The Complaint Fails to Plead Scheme Liability. ............................................... 3

      A.    The Complaint Fails to Plead Any Deceptive Act Apart From Alleged Misstatements. ..................................................................................... 3

      B.    The Complaint Fails to Plead Scienter or Negligence. ........................... 8

      C.    The Complaint Fails to Allege a Scheme in the Offering or Selling of Securities. ................................................................................... 13

II.    The Complaint Fails to Plead a Section 17(a)(2) Violation.............................. 16

CONCLUSION.................................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aaron v. SEC*,
446 U.S. 680 (1980)..................................................................................................18, 19

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d. Cir. 1995)..................................................................................................9

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*,
215 F.3d 219 (2d Cir. 2000).............................................................................................16

*Buford White Lumber Co. Profit Sharing & Sav. Plan & Tr. v. Octagon Props., Ltd.*,
740 F. Supp. 1553 (W.D. Okla. 1989) .............................................................................15

*Edwards v. Thomson Reuters (Tax & Acct.) Inc.*,
No. 1:19-CV-93, 2020 WL 2132348 (S.D.N.Y. May 5, 2020) ..........................................1

*In re Kingate Mgmt. Ltd. Litig.*,
746 F. App'x 40 (2d Cir. 2018) ........................................................................................16

*In re Lernout & Hauspie Sec. Litig.*,
236 F. Supp. 2d 161 (D. Mass. 2003) ................................................................................7

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019)....................................................................................................4, 5

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
543 F. Supp. 3d 96 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31
F.4th 898 (4th Cir. 2022) ............................................................................................16, 17

*McGann v. Ernst & Young*,
102 F.3d 390 (9th Cir. 1996) ...........................................................................................15

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................................5

*Mylan Labs., Inc. v. Akzo, N.V.*,
770 F. Supp. 1053 (D. Md. 1991).......................................................................................1

*New York Times Co. v. U.S. Food & Drug Admin.*,
529 F. Supp. 3d 260 (S.D.N.Y. 2021)..............................................................................16

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
353 F.3d 338 (4th Cir. 2003) .............................................................................................9

*In re Overstock Sec. Litig.*,
    No. 2:19-CV-709, 2020 WL 5775845 (D. Utah Sept. 28, 2020)................................6

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005)...............................................................6, 11

*SEC v. Familant*,
    910 F. Supp. 2d 83 (D.D.C. 2012) ............................................................................7

*SEC v. Friedland*,
    No. 1:18-CV-529, 2019 WL 688054 (D. Colo. Feb. 19, 2019)...............................7

*SEC v. Fuqua*,
    No. 2:06-CV-666, 2008 WL 11380131 (S.D.W. Va. July 11, 2008) .....................15

*SEC v. Hui Feng*,
    No. 2:15-CV-09420, 2017 WL 6551107 (C.D. Cal. Aug. 10, 2017), *aff'd sub nom.*, 935 F.3d 721 (9th Cir. 2019)....................................................................19

*SEC v. Jacoby*,
    No. 1:17-CV-3230, 2021 WL 351176 (D. Md. Feb. 2, 2021) ..............................5, 6

*SEC v. JB Oxford Holdings, Inc.*,
    No. 2:04-CV-7084, 2004 WL 6234910 (C.D. Cal. 2004) ......................................15

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)....................................................................3, 4

*SEC v. Lee*,
    720 F. Supp. 2d 305 (S.D.N.Y. 2010).......................................................................7

*SEC v. Lucent Techs., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ....................................................................4, 5, 6

*SEC v. Penn*,
    225 F. Supp. 3d 225 (S.D.N.Y. 2016)....................................................................5, 8

*SEC v. Radius Cap. Corp.*,
    No. 2:11-CV-116, 2012 WL 695668 (M.D. Fla. Mar. 1, 2012), *aff'd sub nom.*,
    653 F. App'x 744 (11th Cir. 2016) .........................................................................18

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) ...............................................................................3, 7, 8

*SEC v. Sentinel Mgmt. Grp., Inc.*,
    No. 1:07-CV-4684, 2012 WL 1079961 (N.D. Ill. Mar. 30, 2012) .........................18

*SEC v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) ................................................12

*SEC v. Simpson Capital Mgmt., Inc.*,
    586 F. Supp. 2d 196 (S.D.N.Y. 2008)...............................7, 8

*SEC v. St. Anselm Exploration Co.*,
    936 F. Supp. 2d 1281 (D. Colo. 2013)....................................4

*SEC v. Tambone*,
    550 F.3d 106 (1st Cir. 2008), *reh'g en banc granted, opinion withdrawn*, 573
    F.3d 54 (1st Cir. 2009), *reinstated in relevant part on reh'g*, 597 F.3d 436
    (1st Cir. 2010) ........................................................15

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017).......................3, 5, 7, 19

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008)....................................................6

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008)...........................................6

*United States v. Naftalin*,
    441 U.S. 768 (1979)...............................................15, 16

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998)..........................................1

**Rules and Statutes**

Federal Rule of Civil Procedure 9(b)..............................16, 17

Federal Rule of Civil Procedure 12(b)(b) ............................1

Securities Exchange Act Section 10(b) [15 U.S.C. 77j(b)] ...........15

Securities Act Section 17(a) [15 U.S.C. § 77q(a)]...............*passim*

SEC Rule 10b–5 [17 C.F.R. § 240.10b–5] .......................*passim*

Kazem Kazempour respectfully submits this reply in further support of his motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint ("Complaint" or "Compl.") filed in this action by the Securities and Exchange Commission ("SEC").

## PRELIMINARY STATEMENT

The SEC's Opposition to Mr. Kazempour's Motion to Dismiss (Dkt. No. 40) ("Opposition" or "Opp.") does not successfully address the many deficiencies in the Complaint. Instead, the SEC impermissibly makes up new facts, misrepresents others, and even reverses course on its theory of the case.[1] These tactics are unavailing, and the Complaint should be dismissed.

*First*, the Opposition fails to articulate how Mr. Kazempour's filing of a truthful, transparent, and confidential April 27, 2020 Biologics License Application ("BLA") can be transformed into a deceptive act by virtue of the April 27, 2020 allegedly false press release Mr. Pourhassan caused CytoDyn to issue. As the SEC itself acknowledges, Mr. Kazempour did not author, review, approve, or disseminate the press release, nor was he aware of it prior to its issuance. The cases the Opposition cites in support of its meritless theory are easily distinguishable, and its attempt to prop up the Complaint with new (and factually inaccurate) allegations is legally and procedurally inappropriate.

---

[1] Throughout its Opposition, the SEC puts forth new allegations not in the Complaint. The Court should not consider any such allegations. *See Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (court considers only allegations in the Complaint, not facts mentioned for the first time in opposition memoranda); *Edwards v. Thomson Reuters (Tax & Acct.) Inc.*, No. 1:19-CV-93, 2020 WL 2132348, at *4 (S.D.N.Y. May 5, 2020) ("It is well settled that a plaintiff cannot amend her complaint in response to a motion to dismiss.").

*Second*, the Opposition fails to persuasively address the Complaint's clear shortcomings with respect to allegations of Mr. Kazempour's state of mind. The SEC urges the Court to infer that Mr. Kazempour knew or was negligent in not knowing that Mr. Pourhassan would issue the April 2020 press release based on three communications by Mr. Pourhassan to Mr. Kazempour in 2020 and a December 2018 comment from the U.S. Food and Drug Administration ("FDA"). None of these communications hinted that Mr. Pourhassan planned to issue a misleading press release in April 2020. And there is no evidence whatsoever that Mr. Kazempour reviewed, approved, disseminated, or was even aware of the April 2020 press release when issued. Mr. Kazempour is not clairvoyant, as the SEC seemingly would have the Court believe.

*Third*, the Opposition does not credibly explain how Mr. Kazempour's allegedly deceptive conduct in submitting CytoDyn's April 2020 BLA was in the offering or selling of securities, as is required to establish scheme liability under Section 17(a). The SEC's argument that Section 17(a) applies simply because CytoDyn's securities are listed is incorrect, and its reliance on *United States v. Naftalin* misplaced. And its other arguments on this point mischaracterize the Complaint.

And *fourth*, the SEC's novel Section 17(a)(2) claim fails because the Complaint does not contain any allegation Mr. Kazempour obtained money or property "by means of" a false statement. The SEC's argument that Mr. Kazempour's sale of stock—pursuant to a warrant awarded to him nearly two years before the conduct at issue and with the authorization of CytoDyn's CFO many weeks after the April 27, 2020 press release was corrected—somehow satisfies the jurisdictional requirements of Section 17(a)(2) makes no sense. Further, the SEC makes no allegation connecting Mr. Kazempour to any press release.[2]

---

[2] Grasping, the SEC resorts to misdirection, arguing that Mr. Kazempour received warrants for 200,000 shares in April 2020, allegedly upon filing the BLA, and then quickly exercised those

For these reasons, and those set forth in more detail in Mr. Kazempour's Memorandum in Support of His Motion to Dismiss (Dkt. No. 29-1) ("<u>Memorandum</u>" or "<u>Memo.</u>"), the Complaint should be dismissed.

## ARGUMENT

**I.    The Complaint Fails to Plead Scheme Liability.**

### A.    The Complaint Fails to Plead Any Deceptive Act Apart From Alleged Misstatements.

The SEC argues in its Opposition that Mr. Kazempour engaged in a deceptive act by making an incomplete BLA submission to the FDA that he expected to be rejected and that this submission constituted a fraud on CytoDyn investors. Opp. at 12. It did not and indeed could not, and therefore the Complaint fails to state a claim for scheme liability under Rule 10b–5(a) or (c) or Section 17(a)(1) or (3) (the First and Third Claims for Relief).[3]

The SEC's claims based upon a theory of scheme liability fail at the outset. As the SEC's own allegations make clear, CytoDyn investors were allegedly misled by a series of press releases in which the SEC alleges Mr. Pourhassan (*not* Mr. Kazempour) made false statements. Where, as here, a violation is based on an allegedly false and misleading statement, the SEC must prove its misstatement theory by establishing the elements of Rule 10b–5(b) or Section 17(a)(2). *See SEC*

---

warrants and sold the resulting shares for a profit. Opp. at 8, 20. In fact, as the SEC knows, Mr. Kazempour sought authorization from CytoDyn's CFO to exercise what the SEC alleges was a ***previously issued*** warrant for 150,000 shares of CytoDyn stock, and then sold the resulting shares (as alleged, the exercise price for this previously issued warrant was $0.565, which corresponds to a warrant awarded in November 2018, not April 2020). *See* Compl. ¶¶ 141–44. There is no allegation that Mr. Kazempour ever exercised the warrants for the 200,000 shares that the SEC alleges he was awarded in April 2020. And the Complaint only alleges that Mr. Pourhassan texted Mr. Kazempour that CytoDyn's board had approved the issuance of warrants, not that he would be provided warrants upon filing the BLA. *Compare id.* ¶ 96 *with* Opp. at 20.

[3] The SEC does not contest that the heightened-pleading standard applies to all its claims. *See* Memo. at 4.

*v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) ("[A]n actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination."); *SEC v. Wey*, 246 F. Supp. 3d 894, 925 (S.D.N.Y. 2017) ("Claims for scheme liability require the SEC to plead deceptive conduct distinct from any alleged misrepresentations."); *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) ("Scheme liability under subsections (a) and (c) of Rule 10b–5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement."); *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 360 (D.N.J. 2009) ("[O]nly deceptive conduct which is not communicated by way of public statements is reachable by Rule 10b–5(a) and (c)."). Scheme liability is not a "back door into liability for those who [allegedly] help others make a false statement," *Kelly*, 817 F. Supp. 2d at 343 (citation omitted), nor is the SEC permitted to repackage its fraudulent misrepresentation case into a scheme liability case because the statute does not permit such legal double dipping. *SEC v. St. Anselm Exploration Co.*, 936 F. Supp. 2d 1281, 1298–99 (D. Colo. 2013). Because the SEC's case is based solely on alleged misstatements to the market (which the SEC admits Mr. Kazempour did not make), its attempt to circumvent Rule 10b–5(b) by pleading scheme liability should be rejected.

Moreover, the SEC's Opposition does nothing to rescue its deficient claim because the Complaint contains no allegations of deceptive conduct by Mr. Kazempour. The SEC concedes Mr. Kazempour did not draft or disseminate any false press release sent to investors. Opp. at 12, 17. Thus, the SEC's reliance on *Lorenzo v. SEC* is misplaced because there, the defendant committed a deceptive act by disseminating a statement to investors he knew was false. 139 S. Ct. 1094, 1103 (2019).

The SEC attempts to manufacture a scheme liability claim based on Mr. Kazempour's rolling BLA submission that the SEC alleges he expected to be rejected. Opp. at 12. But there was

nothing deceptive about the BLA submission at all. As the SEC admits, Mr. Kazempour was completely transparent in his submission to the FDA—he attached a cover letter disclosing that the application would be supplemented by revised data sets. Compl. ¶ 79; *see also* Memo. at 9. And the additional datasets were provided shortly thereafter, as CytoDyn disclosed. *See* Compl. ¶ 110. This is the opposite of deception. The conduct alleged does not come close to the high standard required to prove scheme liability, which courts have described as "inherently" or "plainly" deceptive or as a "sham." *See, e.g.*, *SEC v. Jacoby*, No. 1:17-CV-3230, 2021 WL 351176, at *10 (D. Md. Feb. 2, 2021) ("The act of creating a document after the fact and backdating it to make it appear as though it existed in 2014 was *plainly deceptive*." (emphasis added)); *Wey*, 246 F. Supp. 3d at 918 ("Defendants must have participated in an *illegitimate, sham or inherently deceptive* transaction where their conduct or role had the purpose and effect of creating a false appearance." (emphasis added) (citation omitted)).[4] Nothing of the sort is alleged here.[5]

The SEC also argues Mr. Kazempour's actions were meant to defraud CytoDyn's investors, *see* Opp. at 12, but there is no explanation about how a confidential, non-public BLA

---

[4] The SEC misrepresents Mr. Kazempour's argument that conduct must be inherently deceptive to mean the conduct must be "inherently unlawful." Opp. at 15. Not so. Mr. Kazempour never argued that the conduct must necessarily be unlawful, but the conduct must be deceitful in itself. *Cf. Lorenzo*, 139 S. Ct. at 1102 (saying scheme liability provisions covered "plainly fraudulent" conduct).

[5] The SEC also argues that because Mr. Kazempour allegedly knew the BLA submission would be denied, the submission was a sham. Opp. at 16–17. But his alleged subjective motivation has nothing to do with whether the conduct is deceptive in itself, as scienter is an element separate from whether a person engaged in a deceptive act. *See, e.g.*, *SEC v. Penn*, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016) (to allege scheme liability the SEC must prove both that the defendant "engaged in a manipulative or deceptive act" and that he "acted with scienter"). Mr. Kazempour's state of mind does not change whether he committed an inherently deceptive act. A person's subjective motivation goes to the issue of scienter. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 642–43 (E.D. Va. 2000) (recognizing "motive and opportunity" as a manner to allege scienter). Without an inherently deceptive act, the Court does not even need to address the question of scienter.

submission could deceive investors. Any purported deception was necessarily a result of the misstatements in the press releases and not in the filing of the BLA, which the investing public never saw or had any information about other than what CytoDyn disclosed. *Cf. Lucent*, 610 F. Supp. 2d at 360 ("If the investing public has no knowledge that an issuer committed an act because the entity has not conveyed any information about that act (nor withheld pertinent information that would make a public statement about that act misleading), there has been no deception because no false impression was created."); *see also United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) ("[D]eception" requires "some act that gives the victim a false impression."); *In re Overstock Sec. Litig.*, No. 2:19-CV-709, 2020 WL 5775845, at *8 (D. Utah Sept. 28, 2020) (dismissing securities fraud claim, where "there was no confusion or false impression in the marketplace with respect to the nature and impact of the [company's statement]").

None of the cases cited by the SEC involving deceptive conduct apply here—all involved conduct that itself deceived investors. *See* Opp. at 13–16.

In *In re Parmalat Securities Litigation*, *see* Opp. at 13–14, the court found that scheme liability existed when defendants securitized worthless invoices. 376 F. Supp. 2d 472, 502, 504 (S.D.N.Y. 2005). The court said the transactions were deceptive by nature because "[t]hey depended on a fiction, namely that the invoices had value," which made it "impossible to separate the deceptive nature of the transactions from the deception actually practiced upon [the company's] investors." *Id.* at 504.

In *Jacoby*, *see* Opp. at 14, the court found that scheme liability existed when a defendant drafted a memorandum, backdated it, and asked another person to send him an email with that backdated document to make it appear like the memorandum had existed before he created it with

6

the purpose of fooling an auditor. 2021 WL 351176, at *9; *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 152–55 (2008) (defendants backdated documents to mislead auditors and to issue misleading financial statements affecting the stock price).

In *SEC v. Familant*, *see* Opp. at 14–15, the court found scheme liability existed when the defendants inflated a company's performance by falsifying awards of credit and repayments for "bogus reasons," while the defendants "knew that their arrangement was illegal." 910 F. Supp. 2d 83, 86, 88 (D.D.C. 2012). The court also reasoned in part that the conduct was deceptive because "no innocent business dealings could explain this conduct away." *Id.* at 93.

In *Wey*, *see* Opp. at 15, the defendants performed several inherently deceptive acts, such as placing shares in brokerage accounts that would conceal the identity of shareholders and locating shell companies to facilitate reverse mergers while hiding the identity of who controlled the shell companies. 246 F. Supp. 3d at 918–19. The court specified that this conduct was deceptive on its own and that this was "not a case in which the allegedly deceptive conduct only became deceptive when the misrepresentation was made." *Id.* at 918; *see also SEC v. Friedland*, No. 1:18-CV-529, 2019 WL 688054, at *4 (D. Colo. Feb. 19, 2019) (defendant similarly hid stock ownership in a company through shell companies). Similarly, in *In re Lernout & Hauspie Securities Litigation*, *see* Opp. at 15, the defendants created shell companies to issue fraudulent licensing agreements, which the court determined "were shams" that inflated the company's profit statements. 236 F. Supp. 2d 161, 166 (D. Mass. 2003).

The crux of the matter is there is *no* case in which a court held that conduct like Mr. Kazempour's was inherently deceptive. Other cases not cited by the SEC support the same result. *See, e.g.*, *Rio Tinto*, 41 F.4th at 54 (providing examples of possible scheme liability claims, including "corruption of an auditing process" and "allegations that a corporate officer concealed

information from auditors"); *SEC v. Lee*, 720 F. Supp. 2d 305, 318 (S.D.N.Y. 2010) (defendants participated in alleged "u-turning" of commodity prices between brokerage houses); *SEC v. Simpson Capital Mgmt., Inc.*, 586 F. Supp. 2d 196, 205 (S.D.N.Y. 2008) (defendants participated in late trading).

Finally, the SEC argues that "it is impossible to separate Kazempour's deceptive conduct from these public misstatements." Opp. at 17. The SEC argues this despite its concession that Mr. Kazempour never made a false statement, *see* Opp. at 12–13, and its failure to allege that Mr. Kazempour ever reviewed or edited any statement. That argument effectively concedes there was no inherently deceptive act here—if the conduct cannot be separated from the misstatements, and if no deception would exist outside of the misstatements, the deception is by definition not separate from the allegedly false and misleading statements. *See, e.g.*, *Rio Tinto*, 41 F.4th at 49 ("[A]n actionable scheme liability claim [] requires something *beyond* misstatements and omissions, such as dissemination."). As a result, the SEC has failed to allege any deceptive conduct apart from the misstatements, and therefore the Complaint does not state a claim under the scheme provisions. *See Penn*, 225 F. Supp. 3d at 235 ("Conduct that is deceptive only because of a subsequent material misstatement . . . cannot be shoehorned into a claim for scheme liability . . . .").

**B.      The Complaint Fails to Plead Scienter or Negligence.**

In its Opposition, the SEC argues that the Complaint establishes scienter by alleging that "[b]ased on his prior communications with [Mr.] Pourhassan, [Mr.] Kazempour knew or was reckless as to whether [Mr.] Pourhassan would issue a press release stating that CytoDyn had filed a completed BLA when, in fact, it had not." Opp. at 18 (quoting Compl. ¶ 94).[6]

---

[6] The SEC also accuses Mr. Kazempour of ignoring these communications in his motion, *see* Opp. at 18, when, in fact, Mr. Kazempour directly addressed these communications, arguing that the

Yet, the Complaint is devoid of any specific facts either known to Mr. Kazempour or that he was negligent in not knowing that even remotely suggest Mr. Pourhassan intended to draft and publish a misleading press release, much less facts that demonstrate a "strong inference" that Mr. Kazempour acted with either "intentional misconduct" or such "severe recklessness" that the danger of misleading investors was "either known to [Mr. Kazempour] or so obvious that [he] must have been aware of it." *See Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343–44 (4th Cir. 2003); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d. Cir. 1995) (speculation and conclusory allegations are not enough; plaintiffs must allege facts giving rise to a strong inference of fraudulent intent).

The alleged communications from Mr. Pourhassan to Mr. Kazempour are minimal. They include: (1) two text messages in February 2020 that Mr. Pourhassan was concerned about the delay in filing the BLA and CytoDyn's stock price; and (2) an email in April 2020 to Mr. Kazempour and others expressing some concerns about CytoDyn's stock price and how it could be affected if the BLA were not submitted, and then directing Amarex to file the BLA no later than next week Wednesday "even if we are short in no matter what portion of whatever it is that we are short." Opp. at 18–19 (quoting Compl. ¶ 75). These communications are in no way connected to the press release issued on April 27, 2020, and there is nothing in those few communications that would suggest to Mr. Kazempour that Mr. Pourhassan intended to issue anything other than an accurate press release regarding the status of the BLA submission.

Swinging and missing here, the SEC then jumps all the way back to a *December 2018* communication between the FDA and Mr. Kazempour in which the FDA raised concerns about an

---

more compelling inference is that Mr. Kazempour thought Mr. Pourhassan would accurately report the BLA submission to the market. *See* Memo. at 12–13.

"overly optimistic timeline for [the] BLA submission." Opp. at 19 (alteration in original) (quoting Compl. ¶ 48). This too is a head scratcher as there is no connection between the FDA's alleged December 2018 concern about the BLA submission timeline and the April 2020 press release. Nor is there any clue therein that Mr. Pourhassan would issue *any* press release, let alone a misleading one roughly 17 months hence.[7]

Finally, the SEC offers Mr. Kazempour's sale of stock pursuant to a warrant to suggest he had ill intent. To support its theory, the SEC engages in misdirection by alleging facts and a sequence of events nowhere in the Complaint. Specifically, the Opposition claims Mr. Pourhassan told Mr. Kazempour that upon the filing of the BLA, Mr. Kazempour would be awarded warrants to purchase shares of CytoDyn stock. Opp. at 20. It then goes on to allege that the day after the April 27, 2020 press release, Mr. Kazempour contacted CytoDyn's CFO about these warrants, exercised them, and then ultimately purchased and sold thousands of shares of CytoDyn stock for profit. *Id.* The SEC would have the Court believe that Mr. Pourhassan directed CytoDyn to award Mr. Kazempour warrants so that Mr. Kazempour would file the BLA and then, as part of this plan, he quickly exercised the warrants and sold the stock. This is *not* what is alleged in the Complaint, nor is it what in fact transpired. *See supra* n.2. Rather, on April 28, Mr. Kazempour contacted the CytoDyn CFO about wanting to exercise a warrant that had been issued to him *nearly two years prior* so he could obtain and sell 150,000 shares of CytoDyn stock, and then followed up with him more than two weeks later seeking authorization. Compl. ¶¶ 141–42. Then, more than a month after his initial inquiry and nearly two months after the April 27 BLA filing, Mr. Kazempour

---

[7] The SEC asserts it is reasonable to infer that Mr. Kazempour knew Mr. Pourhassan would report any BLA filing to the public and that any statement would be a misleading one to appease investors and keep the stock from falling. Opp. at 19, 20. This too is baseless. A more compelling inference would be that Mr. Pourhassan would accurately report the Company's substantial progress on its BLA submission, including the anticipated time to submit revised data sets.

exercised this warrant and sold 150,000 shares of CytoDyn stock. *Id.* ¶ 144. Thus, despite the SEC's attempt in its Opposition to rewrite its own allegations, the warrant Mr. Kazempour exercised had nothing to do with the warrants for 200,000 shares Mr. Pourhassan told Mr. Kazempour that CytoDyn's board approved. *Id.* ¶¶ 95, 96. In fact, Mr. Kazempour never exercised the warrants for 200,000 shares approved in April 2020.

Moreover, the SEC conspicuously leaves out that on May 4, 2020, CytoDyn issued a press release informing investors that the FDA had not considered the BLA complete and would not be complete until additional clinical data sets were submitted. *See id.* ¶ 108. Mr. Kazempour's June 2020 stock sales (with CytoDyn's CFO's blessing) made nearly two months *after* the BLA submission and more than one month *after* CytoDyn's corrective press release simply is not a basis to establish Mr. Kazempour knew, or was reckless in not knowing, that Mr. Pourhassan would issue a misleading press release nearly two months prior or that he was seeking to capitalize on a press release that already had been corrected.

The SEC's reliance on *In re Parmalat* does not help. *See* Opp. at 20. There, the defendant was "intimately familiar" with a client's finances for years and had allegedly "direct[ly] participat[ed] in" the fraudulent activities, by structuring the client's securitization program and working directly with its billing system. 376 F. Supp. 2d at 481, 506. By contrast, as the SEC concedes, Opp. at 3, 10, Mr. Kazempour did not review or approve CytoDyn's false press releases, and the Complaint fails to allege he had any role with respect to the review, approval, or issuance of them. Compl. ¶¶ 109–12.

Nor can the SEC use Mr. Kazempour's alleged expectation that the FDA would reject the BLA submission to establish scienter. *See* Opp. at 19–20; Compl. ¶¶ 84–85. Mr. Kazempour filed the BLA with all information clearly presented to the FDA on behalf of his client and at his client's

direction, and indeed, the supplemental data was provided to the FDA as disclosed. He did so without any knowledge that Mr. Pourhassan would issue any misstatement about the accurate and transparent submission after the fact.

Finally, the SEC's Opposition fares no better with respect to demonstrating that Mr. Kazempour acted negligently. The SEC argues that because Mr. Kazempour previously worked at the FDA, was CEO at Amarex, was familiar with the BLA filing process, understood that Mr. Pourhassan wanted to file an incomplete BLA, and was aware of FDA concerns about a press release issued all the way back in November 2018, he did not exercise reasonable care when he submitted the incomplete BLA and then exercised a previously issued set of warrants in June 2020. Opp. at 21. Whatever this random recitation of disparate allegations means, it does not demonstrate that Mr. Kazempour was negligent with respect to the alleged misinformation communicated to the market by CytoDyn. As noted above, the Opposition utterly fails to set forth any particularized factual allegations that Mr. Kazempour, who was never a CytoDyn employee, had any knowledge of or responsibility for how CytoDyn would draft and issue the April 27 press release, or any other release.

The SEC's attempts to distinguish *SEC v. Shanahan*, 646 F.3d 536 (8th Cir. 2011)—which held that an outside director who relied on a company's finance and accounting professionals when he participated in backdating stock options did not act negligently, *id.* at 546—are similarly unavailing. The SEC argues that, because Mr. Kazempour had "personal expertise in the subject matter at issue" and "previously worked for the FDA," he should have anticipated Mr. Pourhassan's alleged fraud. *See* Opp. at 21. Mr. Kazempour's technical background does not in turn mean that he was negligent as to Mr. Pourhassan's alleged misconduct with respect to drafting or issuing press releases. Thus, the Complaint does not and cannot demonstrate Mr. Kazempour

12

failed to act with reasonable care either with respect to either the BLA submission or the April 2020 press release.

### C.       The Complaint Fails to Allege a Scheme in the Offering or Selling of Securities.

The SEC's Opposition posits that the alleged scheme was in the offering or selling of securities because it was designed to rescue the price of CytoDyn securities trading in the secondary market. *See* Opp. at 4; Compl. ¶ 5. Yet, there is nothing in the Opposition (or Complaint) that ties Mr. Kazempour's conduct—or any alleged scheme for that matter—to an offering (or selling) of CytoDyn securities as is required under Section 17(a)(1) and (a)(3). Nor does the Opposition (or Complaint) offer any credible allegation that Mr. Kazempour's exercise of a longstanding warrant and related stock sale in June was in the offering or selling of securities connected to the alleged scheme in April.

The SEC alleges Mr. Pourhassan deceived investors by issuing a false press release on April 27, 2020, which was designed to increase the price of CytoDyn's stock. As part of the alleged scheme, Mr. Pourhassan ordered Mr. Kazempour to file the BLA despite it being incomplete. Compl. ¶ 82. The SEC alleges Mr. Kazempour participated in the scheme by submitting the incomplete BLA upon Mr. Pourhassan's direction, knowing (or was reckless or negligent) that Mr. Pourhassan would issue the alleged false press release. *See* Opp. at 9; Compl. ¶ 94.

In a far-fetched attempt to satisfy the jurisdictional nexus between the alleged scheme and a securities offering as is required under Section 17(a), the SEC jumps ahead to June 2020, arguing that Mr. Kazempour's stock sales following his authorized exercise of a previously issued warrant satisfies this jurisdictional requirement. It does not.

Mr. Kazempour's later in time stock sales pursuant to an earlier warrant had nothing to do with the scheme the SEC alleges. *See supra* n.2. The sales occurred on June 9 and 10, 2020, nearly two months after the alleged false press release and more than a month after the press release had

in fact been corrected. Compl. ¶ 144. Moreover, the sales occurred after considered consultation with, and approval from, CytoDyn's CFO over a period of several weeks. *See id.* ¶¶ 141–42. Thus, there can be no credible claim that any deceptive conduct was "in the offer or sale" of Mr. Kazempour's stock.

The SEC's arguments attempting to link the alleged deceptive conduct and Mr. Kazempour's sales fall flat. *First*, the SEC points to Mr. Pourhassan's text that Mr. Kazempour would receive warrants for 200,000 shares of CytoDyn stock. Opp. at 22 (citing Compl. ¶¶ 95–97). It's unclear why the SEC finds this fact important, because, as noted above, Mr. Kazempour never exercised these warrants, *see supra* n.2, nor are there allegations that he submitted the BLA because of these warrants. *Second*, the SEC claims Mr. Kazempour inquired about selling the warrants after filing the BLA. Opp. at 22 (citing Compl. ¶¶ 77–80, 86–87, 141). Again, this has no bearing on whether his conduct was in the offer or sale of a security—all that is alleged is he asked about exercising his previously issued warrant. *Third*, the SEC argues that after an additional allegedly false CytoDyn press release was issued on May 13, 2020 (after the April 27, 2020 one had been corrected), Mr. Kazempour exercised his warrant and sold the shares. *Id.* (citing Compl. ¶¶ 107–12, 143–46); *see also supra* n.2. But there are no allegations in the Complaint that Mr. Kazempour's sales were in any way connected to this May 13 press release, nor are there any allegations that Mr. Kazempour ever saw or was even aware of this press release. In short, none of these facts explain how Mr. Kazempour's June stock sales relate to the April 2020 BLA submission.

The SEC next argues that because CytoDyn's securities are publicly traded, Section 17(a)'s offer or sale requirement is satisfied. Opp. at 23. That is not the law. Courts have correctly recognized that Section 17(a) is narrower than Rule 10b–5 and applies only when an alleged

14

misrepresentation is made in an offer or sale of securities. *See* Memo. at 15–18; *see also SEC v. Fuqua*, No. 2:06-CV-666, 2008 WL 11380131, at *1–2 (S.D.W. Va. July 11, 2008) (noting that unlike Exchange Act Section 10(b), Securities Act Section 17(a) "targets fraud related to an offer to sell securities"); *SEC v. Tambone*, 550 F.3d 106, 122 (1st Cir. 2008) ("[W]hereas section 17(a) applies only to brokers and dealers *selling* or *offering to sell* securities, Rule 10b–5 explicitly covers 'any person' who commits a fraudulent act 'in connection with the *purchase* or *sale* of any security.'" (citation omitted) (emphasis in original)), *reh'g en banc granted, opinion withdrawn*, 573 F.3d 54 (1st Cir. 2009), *reinstated in relevant part on reh'g*, 597 F.3d 436, 450 (1st Cir. 2010); *McGann v. Ernst & Young*, 102 F.3d 390, 394 (9th Cir. 1996) (Section 17(a) "impose[s] liability only where the fraud is part of a securities transaction.").[8] No such allegations are made here, so there is no claim under Section 17(a). The Court should not permit the SEC to evade Section 10(b)'s higher burden simply by alleging a violation of Section 17(a)(3) for conduct that plainly falls outside the required jurisdictional nexus.

To support its theory, the Opposition misreads *United States v. Naftalin*, 441 U.S. 768 (1979), and cases interpreting it. *See* Opp. at 21–24. Indeed, *Naftalin* is fully consistent with Mr. Kazempour's reading of Section 17(a), *see* Memo. at 17, and supports the conclusion that Section 17(a) is concerned with misstatements or omissions made in some phase of the offering or selling process. *Naftalin*, which involved the president of a broker-dealer who falsely represented owning stock that he held, 441 U.S. at 770, 778, held that Section 17(a) applied because the defendants'

---

[8] *See also SEC v. JB Oxford Holdings, Inc.*, No. 2:04-CV-7084, 2004 WL 6234910, at *4 (C.D. Cal. 2004) (holding that Section 17(a)(2) applies only to sellers and that defendants were not sellers because they did not "solicit[] purchases in particular funds or [] benefit[] financially from their clients' investment decisions except as a fixed percentage of assets under management"); *Buford White Lumber Co. Profit Sharing & Sav. Plan & Tr. v. Octagon Props., Ltd.*, 740 F. Supp. 1553, 1568–69 (W.D. Okla. 1989) ("Section 17(a) . . . applies to those who offer or sell securities.").

misstatements in placing the sell orders was part of the selling process. *Id.* at 770. Here, by contrast, no allegedly deceptive act by Mr. Kazempour was in connection with the offer or sale of securities, whether it be a new offering or in ordinary market trading.[9]

## II.    The Complaint Fails to Plead a Section 17(a)(2) Violation.

The Complaint does not allege Mr. Kazempour obtained money by means of a false and misleading statement concerning CytoDyn's BLA submission.[10] Nor does the Complaint identify the allegedly false and misleading statement Mr. Kazempour used to obtain money through his June 2020 stock sales.[11] Without such details, the Complaint fails to comply with the heightened pleading standard of Rule 9(b) requiring the SEC to state with particularity the circumstances allegedly constituting fraud. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F.

---

[9] The SEC's Section 17(a)(1) claim also fails because the Complaint fails to allege scienter, and its Section 17(a)(3) claim fails because the Complaint does not allege negligence. *See supra* part I.B.

[10] The SEC notes that Mr. Kazempour failed to address its Section 17(a)(2) claim with any level of specificity, *see* Opp. at 24–25, asserting in a footnote that Mr. Kazempour was under the misimpression that the SEC is not proceeding with that claim. Opp. at 24 n.5. Respectfully, there was no misunderstanding of the SEC's unambiguous representation to the contrary. Regardless, Mr. Kazempour now responds to the issue raised in the SEC's Opposition. *See, e.g.*, *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226–27 (2d Cir. 2000) ("[R]eply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." (citation omitted)). By failing to argue waiver, the SEC has waived this point. *See, e.g.*, *New York Times Co. v. U.S. Food & Drug Admin.*, 529 F. Supp. 3d 260, 273 (S.D.N.Y. 2021) ("When one party opts to address an issue on the merits rather than assert a procedural argument that its opponent waived a claim or argument, that party can be deemed to have 'waived the waiver.'"); *In re Kingate Mgmt. Ltd. Litig.*, 746 F. App'x 40, 43 (2d Cir. 2018) (affirming district court's holding that plaintiffs waived an argument by "failing to raise it in response to Defendants' motion to dismiss").

[11] The Complaint's lone allegation concerning Mr. Kazempour's stock sales—other than those recounting the details of how the sale occurred—is that at that time he "knew that the [April 2020] BLA submission he had filed was not complete and expected the FDA to issue a Refuse to File letter, which it ultimately did [in July]." Compl. ¶ 146.

Supp. 3d 96, 109 (D. Md. 2021) (allegations sounding in fraud must meet 9(b)'s heightened pleading requirements), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022).

Faced with this, the SEC in its Opposition now seeks to plead a Section 17(a)(2) violation by claiming that "[t]he Complaint details how [Mr.] Kazempour obtained hundreds of thousands dollars [sic] by selling CytoDyn stock he received from the company after he filed an incomplete BLA and CytoDyn issued materially false and misleading CytoDyn press releases." Opp. at 25; *see also supra* n.2. Again, this argument misstates the SEC's own allegations regarding which warrant Mr. Kazempour actually exercised. More fundamentally, there is simply no allegation as to how the proceeds of Mr. Kazempour's stock sales were "obtain[ed] . . . by means of any untrue statement of a material fact." 15 U.S.C. § 77q(a)(2). The SEC attempts to bridge this gap by purporting to list eleven allegations in the Complaint, only two of which identify allegedly false and misleading press releases. Opp. at 25–26.[12] This tactic is futile.

The first is the April 27, 2020 press release. Compl. ¶¶ 86–90. Perplexingly, the SEC's Opposition omits from its list, as well as from any discussion concerning its new Section 17(a)(2) claim, that CytoDyn's May 4, 2020 press release *publicly disclosed that CytoDyn's April 27, 2020 BLA submission had not, in fact, been considered complete by the FDA. Id.* ¶ 108. Given this corrective disclosure in May 2020, the SEC cannot credibly claim that the April 27 press release remained false and misleading in June 2020 or was the means by which Mr. Kazempour obtained money.

---

[12] The list, as elsewhere in the Opposition, mischaracterizes the Complaint's allegations. For example, the SEC now argues Mr. Pourhassan told Mr. Kazempour that "CytoDyn would issue [him] warrants to purchase CytoDyn stock upon filing the BLA," Opp. at 25, to create the misimpression that Mr. Kazempour filed the BLA to receive warrants. But the Complaint alleges that Mr. Pourhassan let Mr. Kazempour know that CytoDyn's board had already approved the issuance of warrants. *See* Compl. ¶ 96; *supra* n.2.

The second is CytoDyn's May 13, 2020 press release. The SEC's claim based on this press release is even less viable. Opp. at 26. Neither the Opposition nor Complaint contains any allegation connecting Mr. Kazempour in any way to that press release. *See* Compl. ¶¶ 110–12 (alleging only that Mr. Pourhassan reviewed and approved CytoDyn's May 13 press release). There is no allegation in either the Complaint or the SEC's Opposition that Mr. Kazempour drafted, reviewed, approved, or had any knowledge or awareness of CytoDyn's May 13 press release, let alone of its falsity.

The SEC's Opposition cites no precedent for this novel theory of liability. The cases the SEC does cite, *see* Opp. at 27, stand for the proposition that one need not make or disseminate false statements to have used them, and are easily distinguishable as all are premised on the defendant knowing of the alleged misstatement. *See SEC v. Sentinel Mgmt. Grp., Inc.*, No. 1:07-CV-4684, 2012 WL 1079961, at *15 (N.D. Ill. Mar. 30, 2012) (defendant "admitted . . . he was aware" of a company's practice of using clients' securities to collateralize a portion of a loan to benefit another account); *SEC v. Radius Cap. Corp.*, No. 2:11-CV-116, 2012 WL 695668, at *7 (M.D. Fla. Mar. 1, 2012) (finding allegations sufficient to demonstrate a defendant used a statement he knew to be false), *aff'd sub nom.*, 653 F. App'x 744 (11th Cir. 2016). Here, the alleged misstatement contained in CytoDyn's April 27, 2020 press was publicly corrected well before the stock sales, and there is no allegation that Mr. Kazempour knew about CytoDyn's May 13, 2020 press release or its alleged falsity.

Lastly, contrary to the SEC's suggestion, Opp. at 27–28, there are no allegations showing Mr. Kazempour acted negligently in how he obtained money. *See Aaron v. SEC*, 446 U.S. 680, 697 (1980); *SEC v. Hui Feng*, No. 2:15-CV-09420, 2017 WL 6551107, at *11 (C.D. Cal. Aug. 10, 2017) (negligence for purposes of Section 17(a)(2) is the "fail[ure] to use the degree of care and

skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation." (alteration in original) (citation omitted)), *aff'd sub nom.*, 935 F.3d 721 (9th Cir. 2019).[13] The SEC must do more than allege "a materially untrue statement was made and the person also made money." *Wey*, 246 F. Supp. 3d at 915. Here, all the Complaint alleges is that CytoDyn issued two materially false press releases (as discussed *supra*, one was promptly corrected and Mr. Kazempour is not alleged to have known about the second) and Mr. Kazempour made money selling stock long after. That is far from what is required to plead Mr. Kazempour acted negligently.

For all of the above reasons, the Section 17(a)(2) claim should be dismissed.

## CONCLUSION

For the foregoing reasons and those stated in the Memorandum, the Court should dismiss the Complaint in its entirety against Mr. Kazempour with prejudice.

Dated: May 8, 2023                    Respectfully submitted,


                                      */s/ Benjamin A. O'Neil*
                                      Benjamin A. O'Neil (Fed. Bar No. 29078)
                                      E. Andrew Southerling (*admitted pro hac vice*)
                                      Louis D. Greenstein (*admitted pro hac vice*)
                                      **McGuireWoods LLP**
                                      888 16th Street N.W., Suite 500
                                      Black Lives Matter Plaza
                                      Washington, DC 20006
                                      Telephone: (202) 857-2466
                                      Fax: (202) 828-2966

---

[13] Because the SEC fails to allege Mr. Kazempour acted negligently, it has also failed to plead Mr. Kazempour acted recklessly or knowingly.

boneil@mcguirewoods.com
asoutherling@mcguirewoods.com
lgreenstein@mcguirewoods.com

Caroline Schmidt Burton (Fed. Bar No. 13303)
**McGuireWoods LLP**
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
Telephone: (804) 775-7651
Fax: (804) 698-2049
cburton@mcguirewoods.com

Jason H. Cowley (*admitted pro hac vice*)
**McGuireWoods LLP**
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone: (704) 343-2030
Fax: (704) 373-8830
jcowley@mcguirewoods.com

***Counsel for Defendant***
***Kazem Kazempour***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 8, 2023, a copy of the foregoing document was electronically filed and served on all counsel of record via the Court's CM/ECF system.

*/s/ Benjamin A. O'Neil*
Benjamin A. O'Neil (Fed. Bar No. 29078)
